**In re JOHNS–MANVILLE
CORPORATION, et al.,
Debtors.**

**MANVILLE CORPORATION,
Plaintiff-Appellee,**

v.

**The EQUITY SECURITY HOLDERS'
COMMITTEE, et al.,
Defendant-Appellants.**

No. 85 Civ. 8922 (GLG).
Bankruptcy Nos. 82 B
11656–82 B 11676.
Adv. No. 85–6557A.

United States District Court,
S.D. New York.

April 30, 1986.

Hahn & Hessen, Davis Polk & Wardwell, New York City, for defendants-appellants; George A. Hahn, Herbert L. Ash, Angela G. Tese, Steven J. Mandelsberg, Lowell Gordon Harriss, Deborah S. Guyol, of counsel.

Levin & Weintraub & Crames, New York City, for plaintiff-appellee Manville Corp.; Michael J. Crames, Herbert Stephen Edelman, Andrew A. Kress, of counsel.

Securities and Exchange Com'n, Washington, D.C. (Daniel L. Goelzer, Gen. Counsel, Paul Gonson, Sol., Jacob H. Stillman, Associate Gen. Counsel, Richard A. Kirby, Asst. Gen. Counsel, Stephen M. DeTore, of counsel), Securities and Exchange Com'n, New York City (Ira Lee Sorkin, Regional Admin., Charles E. Padgett, Associate Regional Admin., Nathan M. Fuchs, Chief Counsel, Corporate Reorganization, Virginia M. Handal, of counsel), for plaintiff-appellee Securities and Exchange Com'n.

Gilbert, Segall and Young, New York City, for The Committee of Asbestos Health Related Claimants and/or Creditors; Elihu Inselbuch, of counsel.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for the Legal Representative; Matthew Gluck, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for Committee of Unsecured Creditors; John G. Gellene, of counsel.

## OPINION

GOETTEL, District Judge:

In the annals of mass tort actions and bankruptcy proceedings, nothing has rivalled the boundless asbestos litigation and the attempted reorganization of the company that was the leading manufacturer of asbestos, the Johns-Manville Corporation (now known as "Manville Corporation"). Plaintiff/appellee Manville Corporation ("Manville") is a Delaware corporation well into its fourth year of reorganization under Chapter 11 of the Bankruptcy Code ("the Code"), 11 U.S.C. §§ 1101–74 (1982). Defendant/appellant, the Committee of Equity Security Holders ("the Equity Committee"), was appointed by the bankruptcy court pursuant to 11 U.S.C. § 1102(a)(2) (1982), to represent Manville's common and preferred shareholders. Defendant/appellant Leon Dubin ("Dubin") is a Manville stockholder and a member of the Equity Committee.

On August 16, 1985, the Equity Committee and Dubin brought an action in the Delaware courts ("the Delaware action") seeking to compel a meeting of Manville's shareholders. Manville responded by bringing an action in the bankruptcy court ("the Manville action") to enjoin the Equity Committee and Dubin from pursuing their Delaware action.[1] In a decision and order dated September 20, 1985, Judge Burton R. Lifland, Chief Judge of the Bankruptcy Court for the Southern District of New York, awarded summary judgment to Manville and enjoined the Equity Committee and Dubin, jointly and severally, from prosecuting the Delaware action. *In re Johns-Manville Corp.*, 52 B.R. 879 (Bankr.S.D.N.Y.1985). Judge Lifland also denied the Equity Committee's motions for authority to retain special counsel in Delaware, for advance reimbursement of expenses in connection with holding a meeting of shareholders, and for summary judgment in the Manville action. The Equity Committee and its members[2] now appeal[3]

---

1. In the alternative, Manville asked that the bankruptcy court be required to approve, after notice and a hearing, any and all directors elected pursuant to the requested meeting. Complaint at 11–12.

2. The Securities and Exchange Commission ("SEC"), which did not participate in the proceedings before the bankruptcy judge, filed a brief as a statutory party to this reorganization case under section 1109(a) of the Code, 11

from that decision and order. For the reasons stated below, the decision of the bankruptcy court is affirmed.

## I. *Background*

The history of the groundbreaking Manville reorganization bears on many of the issues on this appeal and is, therefore, recounted below.

### A. The Filing

On August 26, 1982, Manville, one of the nation's largest industrial concerns, and twenty of its subsidiaries and affiliates, filed for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Underlying the filing of the Chapter 11 petition were Manville's actual and contingent liabilities to tens of thousands of persons exposed to and injured by Manville products containing asbestos. As of June 30, 1982, Manville was a defendant in asbestos-related lawsuits brought by approximately 16,000 individual plaintiffs. *In re Johns-Manville Corp.*, 36 B.R. 727, 729 (Bankr.S.D.N.Y. 1984), *leave to appeal denied*, 39 B.R. 234 (S.D.N.Y.1984). Over the preceding six years, four thousand more asbestos-related cases had been disposed of through settlement or trial. *Id.* Because of the long latency period associated with asbestos-related health conditions, Manville anticipated that thousands of new lawsuits would be filed against it during the next twenty to thirty years.[4] *Id.* In fact, an estimated six thousand new asbestos claims arose in the first sixteen months after the filing. *Id.* at 739. No doubt, many more have arisen since then. "The number of post-filing claims increases each day as future claims back into the present." *Id.*

Prior to the filing date, Manville was also named as a defendant in a number of lawsuits seeking massive recoveries for asbestos related property damage. In these suits, various schools and school districts throughout the country sought compensatory and punitive damages from Manville and other asbestos producers for the plaintiffs' own, unknowing use of asbestos-containing products in ceilings, walls, and other school building structures. Since the filing date, two class action suits have been brought on behalf of every public school district and private school in the United States seeking comprehensive redress for the school asbestos problem including compensatory damages for remedial action already undertaken by the schools. Estimates of Manville's potential debt to the school creditors run well into the hundreds of millions. *Id.* at 739.

The immediate financial impact of the pending and anticipated lawsuits was exacerbated by the refusal of Manville's insurance carriers to defend or indemnify Manville. An independent accounting firm advised Manville that, given the attitude of its insurers, Manville would have to book a massive reserve on its financial statements to fund its actual and contingent liabilities. 36 B.R. at 734–35. Manville anticipated difficulties in obtaining unsecured financing, the gradual disintegration of its business, and increasing difficulties in paying past and future judgments. In order to stave off these undesired consequences of its asbestos crisis, the Manville board of directors authorized the Chapter 11 filing. *Id.* at 734–35.

### B. The Appointment of Committees

Pursuant to its powers under section 1102 of the Code, the bankruptcy court appointed committees to represent the in-

---

U.S.C. 1109(a) (1982). Although precluded from initiating the appeal while appearing in a case solely in that capacity, the Commission may participate in the appellate process when other parties appeal. H.R.Rep. No. 595, 95th Cong., 1st Sess. 404, *reprinted in*, 1978 U.S.Code Cong. & Ad.News 5963, 6360 (1978); *see In re Lionel Corp.*, 722 F.2d 1063, 1064 (2d Cir.1983) (listing SEC as appellee).

3. The parties dispute which provision in the bankruptcy code authorizes this appeal. *See infra* 847–50. This in turn impacts upon the appropriate standard of review. *Id.*

4. Manville's conservative estimate was that at least 35,000 asbestos-related suits would be filed in that time. *In re Johns-Manville Corp.*, 36 B.R. 743, 746 (Bankr.S.D.N.Y.1984), *leave to appeal denied*, 39 B.R. 234 (S.D.N.Y.1984).

terests of Manville's major creditor constituencies and its equity security holders.[5] Among the creditor committees appointed were the mandatory unsecured creditors committee, 11 U.S.C. § 1102(a)(2) (1982), and a committee representing institutional and trade creditors. A co-defendant's committee of asbestos manufacturers asserting claims for contribution or indemnity against Manville was also appointed.

The court also appointed a committee to represent the interests of asbestos health claimants. After this Asbestos Health Committee declined to represent future health claimants who had yet to manifest a disease, the bankruptcy court, on motion of one of the co-defendants, determined to appoint a legal representative for future health claimants. *In re Johns-Manville Corp., supra,* 36 B.R. 743. On August 14, 1984, the bankruptcy court appointed Leon Silverman as the "Legal Representative," with the powers of a committee to represent the future claimants, but without power to bind such persons. *In re Johns-Manville Corp.,* Nos. 82 B 11656–11676 (Bankr. S.D.N.Y. Aug. 14, 1984) (order appointing a legal representative for future claimants), *aff'd, In re Johns-Manville,* 52 B.R. 940 (S.D.N.Y.1985).

## C. The Course of the Reorganization

During the pendency of this reorganization, Manville and its subsidiaries and affiliates have continued to operate their businesses as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 & 1108 (1982).

During the first fourteen months of the reorganization, the bankruptcy judge periodically extended the statutory 120-day period during which Manville retained the exclusive right to file a plan of reorganization.[6] In November 1983, Manville filed a proposed plan. Although the Equity Committee endorsed that plan, no creditor constituency did the same. Absent agreement by at least one class of creditors, a plan cannot be confirmed. 11 U.S.C. § 1129 (1982).[7] Unable to obtain confirmation of its plan, Manville has continually sought and obtained still additional extensions of the period within which it maintains the exclusive right to propose a plan of reorganization. *See* 11 U.S.C. § 1121(d) (1982).[8]

Not only has Manville experienced difficulties in formulating an acceptable plan but continued, steady litigation concerning, *inter alia,* the propriety of the initial reference to the bankruptcy court, *see e.g., In re Johns-Manville Corp.,* 9 Collier Bankr. Cas.2d 846 (S.D.N.Y.1983), attempts to dismiss the bankruptcy proceeding, *In re Johns-Manville Corp., supra,* 36 B.R. 727, and the appointment of a legal representative, *In re Johns-Manville Corp., supra,* 36 B.R. 743, has also delayed the progress

---

**5.** Section 1102(a) states,

> (a)(1) As soon as practicable after the order for relief under this chapter, the court shall appoint a committee of creditors holding unsecured claims.
>
> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The court shall appoint any such committee.

11 U.S.C. § 1102(a) (1982).

**6.** The Code provides that "[e]xcept as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter." 11 U.S.C. § 1121(b) (1982). "On request of a party in interest and after notice and a hearing, the court may for cause reduce or increase the 120-day period...." *Id.* at 1121(d).

**7.** The pertinent provision states,

> The court shall confirm a plan only if all of the following requirements are met:
>
> \* \* \* \* \* \*
>
> (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any outsider.

11 U.S.C. § 1129(10) (Supp. II 1984). This section requires the affirmative acceptance of the plan by at least one class of creditors unless all classes of creditors are unimpaired by the plan. 5 *Collier on Bankruptcy* § 1129.02[11] at 1129–36.10 (L. King ed. 1985).

**8.** During that time, Manville was permitted to modify the plan it had originally proposed. *See* 11 U.S.C. § 1127 (1982) ("The proponent of a plan may modify such plan at any time before confirmation....").

of this reorganization. Indeed, the bankruptcy reporters during the period of this reorganization are replete with orders and appeals arising out of the Manville reorganization and concerning every conceivable aspect of bankruptcy law.

A potential breakthrough in the reorganization occurred on August 2, 1985, when Manville announced that its board of directors and the Legal Representative had approved an agreement on principal elements of a plan of reorganization (the "Principal Elements Agreement").

### 1. The Equity Committee's Response

The Equity Committee, which did not participate in the negotiations between Manville and the Legal Representative, was unhappy with the Principal Elements Agreement. According to counsel for the Equity Committee, that agreement would leave common and preferred shareholders with "far less than 10% of what they have today," virtually wiping out their interests. *In re Johns-Manville Corp.*, No. 85 Civ. 8922 (GLG), Transcript of Oral Argument at 71 (S.D.N.Y. Jan. 3, 1986) (Statement of George A. Hahn, counsel to the Equity Committee). On August 14, 1985, the Equity Committee authorized its counsel to bring an action in Delaware to compel the holding of an annual meeting of shareholders [9] and to retain special Delaware counsel. Two days later, the Equity Committee filed a motion with the bankruptcy court to retain counsel, at the expense of the estate, to prosecute the Delaware action. Advance authorization for reimbursement of all expenses associated with holding a shareholders' meeting was also sought.

Dubin and the Equity Committee commenced their Delaware action two days later.

### 2. Manville's Response to the Delaware Action

On or about August 28, 1985, Manville commenced its action in the bankruptcy court to enjoin the prosecution of the Delaware action. By order to show cause dated September 5, 1985, the Equity Committee moved for summary judgment in the Manville action.

At a September 11 hearing on the order to show cause, Judge Lifland denied the Equity Committee's motions for the retention of special counsel, for advance reimbursement of expenses, and for summary judgment. The court expressly reserved decision on whether to grant summary judgment to Manville. Judge Lifland expanded upon his oral findings in a written decision dated September 20, 1985, which granted summary judgment in favor of Manville and enjoined prosecution of the Delaware action. It is from that decision that the Equity Committee now appeals.[10]

### D. The Bankruptcy Court Decision

Judge Lifland first considered and denied the Equity Committee's motion to retain Delaware counsel, holding that the Code did not authorize that retainer. He proceeded to hold that the Equity Committee's request for reimbursement was not ripe for adjudication. The court opined, in dicta, that the proposed meeting would not "substantially contribute" to the reorganiza-

**9.** Manville, with 24 million common and 4.6 million preferred shares continuing to trade on the New York Stock Exchange, had approximately 20,100 common and 19,300 preferred shareholders of record on March 1, 1985. Manville's certificate of incorporation provides that the annual meeting of shareholders for the election of directors shall be held in May of each year. Notwithstanding this provision, Manville has not had a shareholders meeting in the nearly four years since its last scheduled meeting prior to the reorganization in May 1982. Prior

to August 1985, no shareholder had requested a meeting.

**10.** On February 14, 1986, Manville filed a modified plan of reorganization with the bankruptcy court, pursuant to 11 U.S.C. § 1127, *supra* n. 8. Manville recently filed with the bankruptcy court a proposed disclosure statement, a modification of which is forthcoming. *See* 11 U.S.C. § 1125. Manville has yet to receive the approval for its disclosure statement, pursuant to 11 U.S.C. § 1125(b), that would set the confirmation of the plan in motion.

tion.[11] In reaching his decision as to the "substantial contribution" of any meeting, Judge Lifland reasoned that Manville's insolvency, which could not be disputed, gave rise to a fiduciary duty among the directors not only to the shareholders but to the estate. "Consequently, the claim of stockholders that they have an immediate right or need to elect new directors" was deemed "anomolous." 52 B.R. at 885.

According to the bankruptcy court, Dubin, as a member of the Equity Committee, had a similar fiduciary duty to the estate, which he breached by bringing his action in the Delaware courts. The court, therefore, held that Dubin lacked standing to bring the Delaware action either individually or as a member of the Equity Committee.

The bankruptcy court next discussed the central issue before it, the propriety of enjoining an action seeking a meeting of Manville's shareholders. After citing the general reluctance of courts to enjoin meetings of shareholders, even when a company is in reorganization, the court noted that, "[t]he right to compel a shareholder's meeting is not absolute and the existence of various circumstances, including the parties' progress in plan negotiations, can militate against allowing the meeting." 52 B.R. at 887. The court cited the recent progress in the case, the jeopardy that a meeting posed to the reorganization process, and the conduct of the Equity Committee as the other circumstances justifying the issuance of an injunction. Finding that the action was a "core" proceeding, *see* 28 U.S.C.A. § 157, over which it had jurisdiction to enter a final judgment, and finding authority for the issuance of an injunction in section 105 of the Code, the bankruptcy court searched the record and granted summary judgment to Manville, enjoining the Equity Committee and Dubin, jointly and severally, from pursuing their action in the Delaware courts.

### E. The Issues on Appeal

On appeal, the Equity Committee asks us to review the bankruptcy court's rulings that

(1) it had jurisdiction to enter a final order;

(2) Dubin lacked standing to bring the Delaware action;

(3) Dubin and the Equity Committee should be enjoined from pursuing the Delaware action;

(4) Manville was entitled to summary judgment; and

(5) the Equity Committee's application for the retention of special counsel and authorization of fees in connection with a shareholders' meeting should be denied.

At the heart of this appeal is Judge Lifland's grant of summary judgment to Manville enjoining Dubin and the Equity Committee from pursuing the Delaware action. We find, under the appropriate standard of appellate review, that Judge Lifland was correct in this regard.

### II. *Discussion*

#### A. The Standard of Appellate Review

The parties to this appeal vigorously dispute the applicable standard of review under the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("the Act"), 28 U.S.C.A. §§ 151–58 (West Supp.1986), which all concede applies. The Act represents Congress's response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ("*Northern Pipeline*"). In *Northern Pipeline*, the Court invalidated the Code provision that authorized Article I bankruptcy judges to adjudicate claims based upon state or common law. According to the Court, only Article III courts could adjudicate such claims. The Act addresses the *Northern Pipeline* problem by distinguishing between "core" proceedings

11. Section 503 of the Code permits "an equity security holder ... or a committee representing ... equity security holders ... [that makes] a substantial contribution in a case under chapter 11" to recover from the estate actual and necessary administrative expenses. 11 U.S.C. § 503(b)(3)(D) (1982).

848

and "non-core" proceedings or claims "related" to Title 11 cases.[12] Pursuant to section 157(b)(1) of the Act, bankruptcy judges may hear and enter final orders in all cases under Title 11 and in all "core" proceedings,[13] subject to traditional appellate review under section 158 of the Act.[14] Pursuant to section 157(c) of the Act, bankruptcy judges may also hear proceedings that are "non-core" and that are otherwise related to a case under Title 11. But bankruptcy judges may not enter a final order in a "non-core" proceedings unless the parties consent. Absent consent, the bankruptcy court is limited to submitting proposed findings of fact and conclusions of

law to the district court.[15] The district court must review any contested findings or conclusions *de novo* before entering a final order or judgment. The Equity Committee disputes Judge Lifland's finding that the Manville action is a "core" proceeding subject only to traditional standards of appellate review. According to the appellant, this was, at most, a "related to" proceeding, the findings in which must be reviewed *de novo*.

■ In our view, the Manville action is a "core" proceeding within the meaning of the Act. Section 157(b)(2) of the Act provides a non-exclusive list of "core" proceedings.[16] The first of the enumerated catego-

---

**12.** Pursuant to 28 U.S.C. § 1334, as amended by the Act, the district court has "original and exclusive jurisdiction of all cases under Title 11," and has "original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in or related to cases under Title 11." 28 U.S.C.A. § 1334(a) & (b) (West Supp.1986). Under 28 U.S.C.A. § 157(a) (West Supp.1986), each district court may provide that any or all cases and proceedings under Title 11 (core and non-core proceedings) shall be referred to the bankruptcy judges for the district. By order dated July 10, 1984, the Honorable Robert J. Ward, Acting Chief Judge for the United States District Court for the Southern District of New York, made a blanket reference of all cases and proceedings under Title 11 to the bankruptcy judges of this district.

**13.** Section 157(b)(1) provides:
Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
28 U.S.C.A. § 157(b)(1) (West Supp.1986).

**14.** Section 158 provides:
(a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.
\* \* \* \* \* \*
(c) An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings gener-

ally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.
The applicable standard of review on appeal is provided by Bankruptcy Rule 8013 which states,
On an appeal the district court ... may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

**15.** Section 157(c) provides:
(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.
28 U.S.C.A. § 157(c) (West Supp.1986).

**16.** Section 157(b)(2) contains at least four catch-all phrases indicating a congressional intent to protect against unduly restrictive interpretations of the term "core." L. King, *Jurisdiction and Procedure Under the Bankruptcy Act Amendments of 1984,* 38 Vand.L.Rev. 675, 687 (1985).

ries is "matters concerning the administration of the estate." 28 U.S.C.A. § 157(b)(1), (2)(A) (West Supp.1986). About this category, one noted commentator has remarked, "While estate administration matters are not defined, the clause appears to contemplate a very broad panoply of proceedings integral to a case under the Code." L. King, *Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984*, 38 Vand.L.Rev. 675, 688 (1985). This includes the adjudication of actions to enjoin non-bankruptcy proceedings that would inhibit the administration of the bankrupt estate. *In re Lion Capital Group*, 46 B.R. 850, 855 (Bankr.S.D.N.Y.1985) (proceeding seeking to enjoin defendants from pursuing litigation against persons and entities related to the debtors in possession pending conclusion of the proceedings before the bankruptcy court); *In re Huckabee Auto Co.*, 43 B.R. 306, 313 n. 10 (Bankr.M.D.Ga.1984) (Chapter 11 debtor's attempt to enjoin Internal Revenue Service's action against it was a "core" proceeding. It concerned "the administration of the bankruptcy estate, the allowance or disallowance of claims, and the adjustment of the debtor/creditor relationship."). Likewise, actions seeking injunctive relief in order to "increase the chance for consummation of a successful chapter 11 plan of reorganization" are "core." W. Norton & R. Lieb *Jurisdiction and Procedure Under the 1984 Bankruptcy Amendments*, Norton Bankruptcy Law and Practice; Monographs at 97 (1985). This is such a proceeding.

Because the "core"/"non-core" distinction is of constitutional dimensions, it is helpful to analyze the "core" issue in light of the policies underlying the *Northern Pipeline* decision. In *Northern Pipeline*, the Court distinguished among the classes of cases that the bankruptcy courts can and cannot constitutionally adjudicate. The bankruptcy court cannot adjudicate state-created private rights, such as the right to recover damages in contract or tort, or, indeed, the right to call a meeting of shareholders. The Court was careful to distinguish these state-created rights from the "public right" to seek a discharge in bankruptcy or to restructure debtor-creditor relations. The bankruptcy court may constitutionally exercise jurisdiction over issues arising out of those aspects of the bankruptcy proceeding. *Northern Pipeline, supra*, 458 U.S. at 70, 102 S.Ct. at 2871.

■ This action is not, as the Equity Committee would characterize it, an action to compel a shareholders meeting. That action has been and can only be brought in the Delaware courts.[17] Rather, the Manville action seeks to enjoin the Equity Committee from proceeding with an action that will allegedly derail the reorganization. The Manville action implicates none of the concerns that worried the Court in *Northern Pipeline*. It seeks not to vindicate state-created rights, but to enforce the "public right" to adjust debtor-creditor relations. Indeed, in the absence of the Manville bankruptcy proceeding, the Manville action is meaningless, and certainly could not have been brought in a state court. *See Interconnect Telephone Service, Inc. v. Farren*, 59 B.R. 397, 400 (S.D.N.Y.1986) (bankruptcy courts may adjudicate proceedings that are meaningless outside of bankruptcy). As such, it is a "core" proceeding within the meaning of section 157.[18]

17. Although the bankruptcy court commented on the Equity Committee's prospects for obtaining the desired relief in Delaware, 52 B.R. at 889, it was not required to make such a finding. The issue before the bankruptcy court was whether an action seeking to compel a meeting could be enjoined.

18. The first two subsections of section 157 provide the jurisdictional grant of authority for the bankruptcy courts. They state:

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appro-

## B. The Bankruptcy Court's Decision to Enjoin the Manville Action

Pursuant to section 105(a) of the Code, "[t]he bankruptcy court may issue any order ... that is necessary or appropriate to carry out the provisions of [the bankruptcy code]." 11 U.S.C. § 105(a) (1982). "The basic purpose of [section 105(a)] is to enable the court to do whatever is necessary to aid its jurisdiction...." 1 Collier on Bankruptcy ¶ 105.02 at 105–3 (L. King ed. 1985). Section 105(a) should thus empower a bankruptcy court to "enjoin any action which would tend to defeat or impair its jurisdiction." *In re Bush Terminal*, 78 F.2d 662, 665 (2d Cir.1935). The equitable power of the bankruptcy court to enjoin a meeting of shareholders or an action brought to compel a meeting has been implicitly and explicitly endorsed by numerous federal courts. Although many of these decisions precede the enactment of section 105, others postdate that provision. *See In re Potter Instrument Co.*, 593 F.2d 470, 475 (2d Cir.1979) (bankruptcy court has "equitable power to block an election of a new board of directors"); *In re Public Service Holding Corp.*, 141 F.2d 425, 426 (2d Cir.1944) (affirming district court order staying proposed annual meeting of debtor corporation); *In re Bush Terminal, supra,* 78 F.2d at 665, (recognizing the "extraordinary power" of a bankruptcy court to enjoin a meeting of shareholders); *In re Alrac*, 1 B.C.D. 1504, 1506 (D.Conn.1975); ("The court has the power to restrain the defendants and all other stockholders from pursuing the mandamus action pending in the Superior Court...."); *In re Lionel Corp., supra,* 30 B.R. 327 (Bankr.S.D.N.Y. 1983) (denying injunctive relief, but recognizing its availability).

Of course, a bankruptcy court should not lightly employ its equitable power to block an election of a new board of directors. *In re Potter Instrument Co., supra,* 593 F.2d at 475. Thus, the rule, correctly stated by Judge Lifland, that even in bankruptcy, " 'the right of the majority of stockholders [of a corporation in bankruptcy] to be represented by directors of their own choice and thus to control corporate policy is paramount and will not be disturbed unless a clear case of abuse is made out.' " *Id.* at 475 (quoting *In re J.P. Linahan, Inc.*, 111 F.2d 590, 592 (2d Cir.1940)); *see In re Bush Terminal Co., supra,* 78 F.2d at 664–65 (applying same standard). Although this rule is settled, clearcut standards regulating the manner of its application are generally lacking. In particular, the precise circumstances that will make out a showing of "clear case of abuse" have yet to be precisely delineated.

The cases do provide some guidance. A meeting will not be found clearly abusive merely because a plan of reorganization is pending or because the meeting will promote confusion if and when a new plan is filed. *In re Bush Terminal, supra,* 78 F.2d at 664. Nor does the possibility that a new board will redirect or alter the course of a reorganization mandate a finding of clear abuse. *In re Lionel Corp., supra,* 30 B.R. at 330 ("[T]here is nothing in the record that demonstrates how the reorganization is going to be impeded here by the holding of an annual meeting. To the contrary, if the defendants are able to elect a

---

priate orders and judgments, subject to review under section 158 of this title.

28 U.S.C. § 157(a) & (b)(1) (West Supp.1985). According to the SEC, "[i]f the matter lacks an "arising in" or "arising under" nexus with the bankruptcy case, the bankruptcy judge need never reach the question whether a matter is a 'core' proceeding." Brief of the Securities and Exchange Commission at 34. Thus, the bankruptcy judge assertedly erred in not first considering whether this action arises in a case under Title 11 or arises under that Title. Our interpretation of section 157 differs.

"Core" proceeding necessarily have an arising in or arising under nexus to the bankruptcy proceeding. *In re Nanodata Computer Corp.*, 52 B.R. 334, 441 n. 22 (Bankr.W.D.N.Y.1985). The statement in section 157(c)(1) that "a bankruptcy judge may hear a proceeding that is not a "core" proceeding but that is otherwise related to a case under title 11" would not make sense otherwise. Under the SEC's interpretation the class of "core," non-arising in or arising under proceedings that the SEC claims exists would be left in limbo. *Id.* at n. 22. Not surprisingly, of the many courts to have considered the core question, none has proceeded along the lines urged by the SEC.

new board it may be that the reorganization here will take an entirely different turn...") On the other hand, a backdoor attempt to sidetrack an already confirmed plan warrants a finding of clear abuse. *In re Alrac Corp.,* 1 B.C.D. 1504 (D.Conn. 1975). Finally, "a disgruntled stockholder who is frustrated in his efforts to smash the companies which he brought into being because he has been ousted from management and control" cannot seek "a special meeting to elect new directors ... that ... might result in unsatisfactory management and would probably jeopardize both [the debtor's] rehabilitation and the rights of creditors and stockholders—sounding the 'death knell' to the debtor as well as to the appellant himself." *In re Potter Instrument Co., supra,* 593 F.2d at 474, 475.

Outside of the narrow class of circumstances that the courts have specifically addressed, the bankruptcy court has discretion to determine whether the considerations in a particular case warrant a finding of clear abuse. *In re Public Service Holding Corp., supra,* 141 F.2d at 426. The burden rests on those seeking to enjoin the meeting to show that "the harm likely to flow from the stockholders' action [is both real] and disproportionate to the good obtainable." *In re Bush Terminal Co., supra,* 78 F.2d at 665.[19]

Had the bankruptcy court enjoined the appellants solely on the possibility that a meeting might delay the reorganization or alter its course, the above-cited authorities might well counsel a reversal. Judge Lifland, however, premised his decision to enjoin the Delaware action on far more than a fear that that action would redirect the Manville reorganization proceeding. Rather, he found that "[t]he holding of a shareholder's meeting at this juncture will seriously jeopardize any attempt at successfully reorganizing Manville." 52 B.R. at 889.

In addition, he found that the Equity Committee's efforts were designed not simply to redirect the course of the reorganization, but rather to "strengthen [the Equity Committee's] bargaining position and provide additional leverage." *Id.* at 887. The record before Judge Lifland, as well as his accumulated knowledge of the nature and character of the Manville reorganization, amply support both findings, which, in turn, supply the predicate for Judge Lifland's finding of clear abuse.

### 1. Jeopardy to the Reorganization

That the Manville reorganization is unique and unusual and faces an unprecedented challenge is beyond dispute. *See In re Johns Manville Corp.,* No. 85 Civ. 8922 (GLG), Transcript of Oral Argument at 13 (S.D.N.Y. Jan. 3, 1986) (Statement of George Hahn, Counsel to the Equity Committee) ("[I]t is no question that it is an unusual reorganization that faces an unprecedented challenge."). Most unique is the spector of an endless stream of future health claimants seeking compensation for their disabilities. These future, unknown health claimants, their present-day counterparts, the property claimants, as well as the traditional classes of secured and unsecured creditors, and equity security holders place a staggering demand on the finite resources of a corporation in reorganization. Not surprisingly, the various interests have experienced great difficulty in formulating and agreeing upon a plan of reorganization. The debtor first reached agreement with its equity security holders more than two years ago, *see supra* p. 845, but was unable to persuade any creditor constituency to acquiesce in that agreement. During the first three years of the reorganization, arduous negotiations between the Manville board and all creditor constituencies failed to produce an agree-

---

**19.** The SEC asserts that in deciding whether the requisite showing of clear abuse is present, the Court should distinguish between the plan negotiation phase of the case—the period preceding the filing of a reorganization plan and court approval of a disclosure statement—and the subsequent plan confirmation phase. The SEC asserts that during the plan negotiation phase, there should be a strong presumption in favor of shareholder suffrage. According to the SEC, "[o]nly a showing of extraordinary circumstances resulting in a subversion of the reorganization process would justify an injunction" during this phase. Brief of the Securities and Exchange Commission at 13. Since we find such circumstances present, we need not consider the SEC's argument, which finds no support in the case law.

ment with any creditor constituency. *See In re Johns-Manville Corp.*, 36 B.R. at 731 (detailing negotiations over the first sixteen months of the reorganization). Not until three years after the initial Chapter 11 filing did any creditor preliminarily agree to the principal elements of a plan of reorganization. Judge Lifland thus described the Principal Elements Agreement as "a major breakthrough in the case," ... "reached after three years of fractious negotiating." 52 B.R. at 887. The sluggish pace of progress toward formulation of a plan is indicative of the unique challenge posed by the Manville reorganization. It also highlights the potentially disastrous effect on the ultimate prospects for reorganization of the election of a new board of directors.

The election of a new board, at this juncture, would not only force the negotiation process back to square one and remove any short-term prospects for successfully reorganizing Manville, but it would substantially reduce the ultimate prospects for a successful reorganization. It is unlikely that any creditor constituency will willingly endure the necessary years of negotiation, confrontation, and stalemate that would necessarily precede the filing of a new plan. In an affidavit supplied to Judge Lifland, Manville's principal negotiator, G. Earl Parker, stated, "The consequences flowing from yet another stalemate would place in jeopardy the ability of the Debtors ever to confirm a plan of reorganization...." Affidavit of G. Earl Parker ¶ 7, Document 12 on appeal. Intimately familiar with the tortuous background of the reorganization, Judge Lifland was more

than justified in accepting Mr. Parker's conclusions and finding that the proposed stockholders' meeting would jeopardize the reorganization process.

### 2. The Equity Committee's Motivation

As noted above, the Equity Committee's desire to redirect the course of the reorganization does not supply the showing of clear abuse necessary to enjoin a meeting of shareholders. However, the dim prospects for a successful reorganization following the election of a new board led the bankruptcy court to question the Equity Committee's motivation in seeking a new election. By its own admission, the Equity Committee brought the Delaware action in order to derail the proposed plan.[20] Either the appellants seek to destroy any prospect for a successful reorganization, or they wish to use the threat of a new board as a lever vis-a-vis other interested constituencies and vis-a-vis the current Manville board. Neither the interest in torpedoing the reorganization nor in acquiring a chip to be bargained away are legitimate.[21] Judge Lifland, who was well aware of the dynamics of the Manville bankruptcy, had ample evidence from which to conclude that by either attempting to destroy the prospects for a successful reorganization or by merely attempting to strengthen its bargaining position without changing the current board, the Equity Committee was acting in a clearly abusive manner.

Together with the fragile nature of this reorganization and the likelihood that a meeting of shareholders would doom that process, the appellants' questionable motivation makes out the requisite clear case of

---

**20.** In a memorandum of law filed with the Bankruptcy Court, the appellants stated,

> Manville has alleged nothing more than that the Equity Committee rejects the Principal Elements Agreement made by the incumbent Board with the Legal Representative and desires a shareholders' meeting to enable shareholders if they wish, to elect a Board which may in turn act to reconsider the Principal Elements Agreement. To this the Equity Committee pleads guilty.

Reply Memorandum of Law of the Committee of Equity Security Holders at 5, Document 19 on appeal, *quoted in* 52 B.R. at 887–88.

The Equity Committee took the position before Judge Lifland that "it had no complaint with the day to day and overall management of Manville's business by the current board of directors." 52 B.R. at 888. The Equity Committee maintained its position at oral argument on this appeal.

**21.** The Equity Committee's short-range approach to the long-range societal problems implicated in this reorganization is particularly troubling. While the parties continue to jockey for position, and legal fees mount, the individuals most deeply affected by this proceeding, the asbestos health claimants, continue to suffer.

abuse. Any potential benefit from the Delaware litigation is easily outweighed by the concomitant dangers to the reorganization process.[22]

### 3. The Award of Summary Judgment

In assessing its own jurisdiction to preside over the Manville reorganization, the bankruptcy court has stated, "Manville is a financially besieged enterprise in desperate need of reorganization of its crushing real debt, both present and future." 36 B.R. at 741. Judge Lifland's concern extends not only to the corporate entity that is Manville, but to the thousands of asbestos victims, future and present, in need of some form of relief. Thus, Judge Lifland has also observed, "[U]pon dismissal [of the Chapter 11 proceeding], Manville would become a target for economic dismemberment, liquidation, and chaos, which would benefit no one except the few winners of the race to the courthouse." *Id.* at 740. The Manville reorganization constitutes a novel attempt to tackle the vexing and tragic societal problem of asbestos health and property claims. The issuance of injunctive relief in this proceeding preserves the jurisdiction of the bankruptcy court to proceed toward this end. Having made the requisite finding of clear abuse, the bankruptcy court did not abuse its discretion by granting summary judgment in favor of Manville. *See Project Release v. Provost,* 722 F.2d 960, 969 (2d Cir.1983); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* ¶ 56.12 at 56–331 (2d ed. 1985) (A court may grant summary judgment to a non-moving party if no genuine issues of material fact have been shown.). Although it might be argued that granting summary judgment was inappropriate absent an evidentiary hearing, there was nothing to be gained in this instance from a full evidentiary hearing. Such a hearing could have done little to enlighten a bankruptcy judge who is already fully informed as to the prospects for this reorganization. Although a hearing might have elicited competing views about the prospects for a successful reorganization, afterwards Judge Lifland would have known nothing that he did not know prior to issuing his decision. An award of summary judgment was, therefore, appropriate.

### 4. The Award of Injunctive Relief

Moreover, the injunctive relief granted was within the scope of the equitable powers of the bankruptcy court under section 105(a). *See supra* pp. 850–51. Since the bankruptcy court created the Equity Committee, *see* 11 U.S.C. § 1102(a)(2) (1982), *supra* p. 845 n. 5, the bankruptcy court has the power to enjoin that committee from pursuing an action in another court. Moreover, it could also enjoin Dubin, as a member of that committee. To the extent that Dubin brought the Delaware action in his own behalf, the precedents also empower the bankruptcy court to enjoin him individually.[23] *In re Alrac, supra,* 1 B.C.D. 1504 (stockholder enjoined). Indeed, the sweeping language of section 105(a) and the applicable precedents permit the bankruptcy court to enjoin the Delaware action itself. *See In re Bush Terminal, supra,* 78 F.2d at 665 ("A court of equity or bankruptcy may enjoin any action which would tend to defeat or impair its jurisdiction.").

---

**22.** The Equity Committee's breach of a supposed fiduciary duty to the estate was not an alternative basis for the bankruptcy court's decision to enjoin the Delaware action. The bankruptcy court considered the fiduciary duty of directors only in the context of whether the meeting would "substantially contribute to the reorganization" thereby entitling the Equity Committee to reimbursement from the estate. *See supra* pp. 846–47. The bankruptcy court's discussion of the propriety of injunctive relief and summary judgment made no reference to the fiduciary duties of directors. Our own decision in no way relies on the bankruptcy court's dubious analysis of those fiduciary duties. *See infra* n. 23.

**23.** The bankruptcy court found that the Equity Committee, and Dubin as a member of that committee, had a fiduciary duty to the estate. Encompassed within that duty was an obligation to "contribute[ ] substantially to the reorganization." 52 B.R. at 886. According to the bankruptcy court, that duty precluded Dubin, as a member of the Equity Committee, from maintaining the Delaware action in his individual capacity. *Id.* at 886–87.

The Equity Committee asserts that "[t]his appeal will determine the survival of annual shareholders meetings in reorganizations." Brief of Appellants Committee of Equity Security Holders and its Members at 7. No such earthshaking ramifications derive from the bankruptcy court's ruling. In fact, the right of shareholders to hold meetings and elect directors remains, as in every case, in the absence of a clear case of abuse of the reorganization process. Although in this extraordinary and fragile reorganization, an action to compel an annual shareholders meeting is appropriately enjoined, in the overwhelming majority of reorganizations, the right to such a meeting will remain unimpaired. Like the Second Circuit in its recent *Texaco v. Pennzoil* decision, "[w]e hasten to note that our decision rests ... upon the extraordinary circumstances of this case.... For these reasons our decision ... is obviously a narrow one in its scope and application." *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1157 (2d Cir.1986).

### III. *Conclusion*

The decision of the bankruptcy court enjoining Leon Dubin and the Equity Committee, jointly and severally, from pursuing their Delaware action is affirmed. Because the retention of Delaware counsel and the holding of a meeting are meaningless in the absence of an action seeking or an order compelling a meeting, the Court need not consider the bankruptcy court's denial of authorization to retain Delaware counsel or its denial of allowance of fees in connection with holding a meeting.[24]

The decision of the bankruptcy court is affirmed.

SO ORDERED.

No doubt, a committee and its members are fiduciaries for each of the parties that it represents. *In re Bohack Corp.*, 607 F.2d 258, 262 n. 4 (2d Cir.1979). As Judge Lifland himself stated in an earlier opinion, "the individuals constituting a committee should be honest, loyal, trustworthy and without conflicting interest and with undivided loyalty and allegiance to their constituents." *In re Johns-Manville Corp.*, 26 B.R. 919, 925 (Bankr.S.D.N.Y.1983). But neither a committee nor its members has any underlying duty to the debtor or to the estate. Rather, a committee's only duty is to pursue the interests of its members. That pursuit, together *with the representation of other committees,* collectively furthers the reorganization process. *In re Daig Corp.*, 17 B.R. 41, 43 (D.Minn.1981) ("The creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally. On the contrary, it is purposely intended to represent the necessarily different interest and concerns of the creditors it represents. It must necessarily be adversarial in a sense, though its relation with the debtor may be supportive and friendly. There is simply no other entity established by *the Code to guard those interests.* The committee as the sum of its members is not intended to be merely an arbiter but a partisan which will aid, assist, and monitor the debtor pursuant to its own self-interest.").

We, therefore, disagree with Judge Lifland's conclusion that the Equity Committee and Dubin had fiduciary duties to the estate that prevented Dubin from bringing his claims individually. This does not, of course, negate our conclusion that the bankruptcy court could enjoin Dubin from proceeding in his individual capacity.

24. Since we do not reach the propriety of these rulings, we need not reach the question of their appealability, which the parties dispute.