In re DONLEVY'S, INC., et al., Debtor.

The CREDITORS' COMMITTEE OF the ESTATE OF DONLEVY'S, INC., Plaintiff,

v.

KITTY FAN KOO and Names for Dames, Inc., Defendants.

Bankruptcy Nos. 87–40702 to 87–40719.
Adv. No. 89–4050.

United States Bankruptcy Court, D. Massachusetts.

Feb. 23, 1990.

Thomas C. Boscarino, Boatman & Boscarino, Glastonbury, Conn., for Creditors' Committee, plaintiff.

Jeffrey S. Ogilvie, Friedman & Atherton, Boston, Mass., for Kitty Fan Koo and Names for Dames, Inc., defendants.

OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Names for Dames, Inc. ("Names") and Kitty Fan Koo (collectively the "Defendants") move for summary judgment in this adversary proceeding, which has been brought by the Official Unsecured Creditors' Committee (the "Committee") pursuant to court authorization. In its complaint, the Committee alleges, with respect to each defendant, that on June 8 and 9, 1988 the defendant "entered into an oral contract with plaintiff by which plaintiff for good and valuable consideration agreed to accept an Amended Plan of Reorganization which provided, in pertinent part, for payment of 39% in cash on confirmation to general unsecured creditors ... and defendant for good and valuable consideration agreed to fund ... [such plan]."

The essential facts are uncontested. In March of 1988, the Defendants engaged one Bernard Gimbel ("Gimbel") to act as their agent to acquire all or substantially all of the common stock of Donlevy's, Inc. (the "Debtor"), which was then in a Chapter 11 proceeding here. Gimbel proceeded to acquire a controlling stock interest in the Debtor, but he claimed the right to hold the stock on his own behalf and not for the Defendants. The Defendants brought suit against Gimbel in New York state court to resolve the matter. Thereafter, on June 3, 1988, entities affiliated with the Defendants moved in this court for the appointment of a trustee to replace Gimbel as the Debtor's chief executive officer. A hearing on that motion was scheduled for June 9th at 10:00 A.M. The Debtor had on file at that time a plan providing for a 30% payment to unsecured creditors.

On June 8th, a series of telephonic conferences was held among counsel to the Defendants, counsel to the Committee, and Gimbel. At the scheduled court hearing the next day, a long colloquy took place on the record among Defendants' counsel, Committee's counsel, Gimbel, Debtor's counsel, and the court. Defendants' counsel announced that an "agreement" had been reached during the prior day's telephone conversations, and proceeded to spell out its terms. He said that in consideration of $250,000 Gimbel would deliver to

the Defendants the capital stock of the Debtor which he had purchased, with the control which it entailed, and that Names or its nominee was "prepared . . . to fund a chapter 11 plan . . . [which] will provide for the payment of thirty-nine percent [39%] . . . in cash on confirmation to general unsecured creditors . . ." Defendant's counsel further stated that he had brought with him a $500,000 certified check payable to the Debtor to replace the loan made by Gimbel to the Debtor in that amount, and that he was prepared to post a $1 million letter of credit "in order to assure that confirmation of this plan go forward." And because new management would be under the control of Names, counsel said that the moving parties would withdraw their motion for appointment of a trustee. I then stated that I did not "know offhand of any reason why there wouldn't be an enforceable contract in existence as of now, which would simply be reduced to writing." Defendants' counsel replied: "That is the very reason for my trip and for placing it on the record, your Honor." Counsel to the Committee, counsel to the Debtor and Gimbel then confirmed the agreement in some detail, with counsel for the Defendants imposing as a condition of their obligation the absence of any substantial adverse change in the Debtor's condition. Toward the end of the colloquy, all parties waived the defense of the statute of frauds, at my suggestion. The hearing closed with counsel for the Defendants confirming that the "contracting party" was "Names for Dames."

Names, or its nominee, thereafter acquired the Debtor's stock from Gimbel. It notified the Committee, however, that it would not propose a 39% plan because of asserted changes in the Debtor's financial condition. A 30% plan was subsequently confirmed, with the Committee reserving whatever rights creditors might have against the Defendants by reason of the events of June 8th and 9th.

I. *Committee's Capacity to Contract and Consideration for Defendants' Obligation*

The Defendants contend that no contract for a 39% plan took place during the tele-phone conversations of June 8th or by reason of the statements in court on June 9th. A creditors' committee, they say, has no power or capacity to contract—only to negotiate a plan for general acceptance by the creditor body. As they view it, the only contract that can take place concerning a Chapter 11 plan of reorganization is the formal plan proposal and its acceptance by creditors holding the requisite number and amount of claims. They point out that in order for a plan to be confirmed it must be formally proposed, with adequate disclosure, and accepted by creditors holding at least two-thirds in amount and more than one-half in number of the allowed claims held by creditors that have accepted or rejected the plan. *See*, 11 U.S.C. §§ 1121–1129.

The binding contract flowing from plan confirmation is not, however, the only contract that can be made with respect to a plan. A creditors' committee may "participate in the formulation of a plan [and] advise those represented by such committee of such committee's determination as to any plan formulated. . . ." 11 U.S.C. § 1103(c)(3). Acting under this statutory authority, it is customary for a creditors' committee to negotiate a plan with a debtor or with a potential purchaser of a debtor's stock. True, the committee does not have statutory authority to bind creditors to the acceptance of a plan proposal, whether that proposal is made informally, as here, or through a formal plan of reorganization with a court-approved disclosure statement. But it is perfectly consistent with a committee's power to "participate in the formulation of a plan" for the committee, as agent for the class of creditors it represents, to receive an offer concerning a plan. The question then becomes whether that offer is unenforceable because unsupported by either consideration or reliance.

The agreement spelled out in court involved three parties—Names, Gimbel and the class of unsecured creditors represented by the Committee. Names made a two-part commitment in exchange for Gimbel's promise to transfer the Debtor's stock.

Names promised to pay Gimbel $250,000 and to cause the Debtor to propose a funded 39% plan once it acquired control of the Debtor. The consideration for this entire commitment was Gimbel's promise to transfer the stock. The Committee made no promise, at least not on the court record. Even if the Committee expressly or impliedly promised to recommend such a plan, this would not constitute consideration for Names's promise of a 39% plan. The Committee had a duty to recommend the 39% plan over the 30% plan already on the table, and Names knew this. The consideration for a promise must be that which is received and given in exchange for the promise, as the price of the promise. Restatement (Second) of Contracts § 71 (1981); W. Jaeger, *Williston on Contracts* § 112 (3d ed. 1959). Names was interested in one thing—obtaining control of the Debtor; it was Gimbel's promise to provide that control which Names sought and received in exchange for both of its promises. This is, valid consideration. More than one promise may be supported by the same consideration, if that consideration would be sufficient to support either promise. Restatement (Second) of Contracts § 77 (1981); 1 A. Corbin, *Corbin on Contracts*, § 125 (1963 & Supp.1989); *Barnett v. Rosen*, 235 Mass. 244, 126 N.E. 386 (1920).

It is not fatal to the Committee's case that the creditors are third party beneficiaries. Even a beneficiary not a party to the contract and furnishing no consideration has direct rights against the promisor. 2 W. Jaeger, *Williston on Contracts*, §§ 356, 357 (3d ed. 1959). Massachusetts [1] was for many years one of the few states which raised barriers to a third party beneficiary suing on the contract, *Id.*, although it permitted numerous exceptions to the general rule prohibiting the suit. *See, e.g., Mellen v. Whipple*, 67 Mass. (1 Gray) 317 (1854); *Saunders v. Saunders*, 154 Mass. 337, 28 N.E. 270 (1891); *Borden v. Boardman*, 157 Mass. 410, 32 N.E. 469 (1892). *Compare Johnson—Foster Co. v. D'Amore Const. Co.*, 314 Mass. 416, 50 N.E.2d 89 (1943). But Massachusetts now recognizes the rights of both creditor beneficiaries, *Choate, Hall & Stewart v. S.C.A. Services, Inc.*, 378 Mass. 535, 392 N.E.2d 1045 (1979), and donee beneficiaries, such as the creditors here who are not creditors of Gimbel. *Flattery v. Gregory*, 397 Mass. 143, 489 N.E.2d 1257 (1986); *Rae v. Air-Speed, Inc.*, 386 Mass. 187, 435 N.E.2d 628 (1982). The creditors were direct rather than collateral beneficiaries of Names's promise concerning the plan. *Compare Plymouth Housing Authority v. Town of Plymouth*, 401 Mass. 503, 517 N.E.2d 470 (1988). It is immaterial that the promise of a 39% plan seems to have been induced by the Committee rather than, as is more typical, by the party furnishing the consideration. Indeed, because the creditors were parties to this contract through the Committee, they may have rights even under prior Massachusetts case law. *See, e.g., Borden*, 157 Mass. 410, 32 N.E. 469 (court stressed absence of promise made directly to plaintiff).

## II. *In Personam Jurisdiction*

The Defendants' final argument may be quickly dispatched. They contend that this court lacks *in personam* jurisdiction over them, on the ground that their counsel was in New York during the telephone conversations of June 8th. This is disingenuous. The Defendants confuse personal jurisdic-

---

1. The law of Massachusetts governs. The statements were made in court in this Commonwealth, and this Commonwealth has a strong nexus with the transaction through the presence here of the reorganization proceeding and the Debtor's principal office. It is immaterial that Gimbel and counsel to the Defendants were in other states during the telephone conversations of June 8th. *See Bushkin Assoc., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985) (the court rejecting the notion that contract choice of law issues turn on where the contract is made, but rather choosing to emphasize the seven choice-influencing factors listed in the Restatement (Second) of Conflict of Law § 6(2) (1981)) (The § 6(2) factors are: "(a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied").

**4**

tion with principles of conflicts of laws. They also ignore their statements made the next day in this court. Most important, they fail to take into account a bankruptcy court's ability to obtain personal jurisdiction through nation-wide service of process. *See,* B.R. 7004(d). Moreover, even without nation-wide service of process, this court would have personal jurisdiction over the Defendants by reason of the activities of their agent in Massachusetts, in this very court. *See,* Fed.R.Civ.P. 4(e); MASS.ANN. LAWS ch. 223A, § 3 (Law.Coop.1986 & Supp.1989).

A separate order has issued denying the motion.