## In re SPM MANUFACTURING CORPORATION, Debtor.

## OFFICIAL, UNSECURED CREDITORS' COMMITTEE, Appellant,

v.

### Peter M. STERN, Chapter 7 Trustee of SPM Manufacturing Corporation, and Robert and Frances Shaine, Appellees.

No. 92–1379.

United States Court of Appeals, First Circuit.

Heard Sept. 15, 1992.

Decided Jan. 21, 1993.

Rehearing and Rehearing En Banc Denied Feb. 24, 1993.

William C. Penkethman with whom David J. Noonan and Kamberg, Berman, P.C., Springfield, MA, were on brief, for appellant.

Peter M. Stern with whom Cynthia J. Gagne and Law Office of Peter M. Stern, Springfield, MA, were on brief, for appellee Peter M. Stern, Chapter 7 Trustee of SPM Mfg. Corp.

J. Daniel Marr with whom Hamblett & Kerrigan P.A., Nashua, NH, was on brief, for appellees Robert and Frances Shaine.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BRODY,* District Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

The district court affirmed a bankruptcy court order which compelled a secured creditor to pay to the debtor's estate a portion of the proceeds it had received in satisfaction of its allowed secured claim. The bankruptcy court's order contravened an agreement between the secured creditor and the general, unsecured creditors to share in the proceeds from the former's secured interest. The bankruptcy court believed, and the district court agreed, that such an agreement violated Bankruptcy Code policy. Appellant, the Official Unsecured Creditors' Committee which entered the agreement on behalf of the general, unsecured creditors, argues that the bankruptcy court's order to pay over the disputed funds to the estate was an error of law. We agree with appellant, and so reverse the district court judgment, vacate the order in part and remand to the bankruptcy court.

## I. BACKGROUND

Debtor SPM Manufacturing Corporation ("SPM" or "Debtor"), a family-owned manufacturer of photo albums and related products based in Springfield, Massachu-

setts, filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Code") on April 3, 1989, in the United States Bankruptcy Court for the District of Massachusetts: See 11 U.S.C. § 1101 *et seq.* SPM management continued to operate the company as a debtor in possession ("DIP") pursuant to 11 U.S.C. §§ 1101(1) and 1107. Appellee Robert Shaine continued to serve as president of SPM and was an unsecured "insider" creditor. Appellee Frances Shaine continued on as chair of the board of SPM, in addition to being a stockholder and having responsibility for the general administrative functions of SPM.

Appellant Official Unsecured Creditors' Committee ("Committee") was appointed by the bankruptcy court pursuant to 11 U.S.C. § 1102(a) on April 13, 1989. When SPM filed for bankruptcy protection, the company owed approximately $5.5 million to the general, unsecured creditors represented by the Committee, including International Paper Company and other suppliers.[1] Approximately $9 million was owed to Citizens Savings Bank ("Citizens" or "Bank"), which held a perfected, first security interest in all of SPM's assets except certain real estate. Unsecured debts that had priority under section 507(a) of the Code, 11 U.S.C. § 507(a), consisted primarily of a tax claim of approximately $750,000 held by the Internal Revenue Service ("I.R.S.") for unpaid withholding taxes. The Shaines are personally liable for whatever portion of that tax claim is not paid out of the estate.[2]

Chapter 11 proceedings to reorganize SPM were contentious and unproductive. Though the DIP filed a plan for reorganization in September 1989, later amended in November 1989, the plan was never confirmed. The Committee decided at about the same time that reorganization under

---

* Of the District of Maine, sitting by designation.

1. For simplicity, this opinion uses only the approximate value of the various claims against the Debtor. The exact amounts of these claims are not at issue in this appeal.

2. Other creditors not relevant to this appeal are various "insiders" and Heritage Bank for Savings, which held a valid first mortgage on real estate owned by SPM in Holyoke, Massachusetts.

current management was unfeasible, but that a liquidation of SPM's assets would leave nothing for any creditor besides Citizens, whose secured claim exceeded the value of its collateral (substantially all of SPM's assets). Consequently, the Committee began discussions with Citizens about cooperating in the bankruptcy proceedings to maximize the value of SPM's assets and provide some return to the general, unsecured creditors.

On October 12, 1989, the Committee and Citizens executed the agreement ("Agreement") which is the subject of this appeal. The Agreement recites the opinion of Citizens and the Committee that, "through their mutual cooperation ... in order to maximize recovery on their respective debts it is in their mutual interest to enter into this Agreement." The contract explicitly states that the Committee negotiated and executed the Agreement on behalf of the general, unsecured creditors, "[e]xclusive of the Internal Revenue Service and potential 'insider' creditors."

Citizens and the Committee agreed to cooperate in the following manner: (1) to "take all actions reasonably necessary, including, without limitation, initiation of motions and filing of other pleadings in the Proceeding, to replace Debtor's current CEO with [a] New Manager"; (2) "to work together to formulate a joint plan of reorganization"; and (3) to "negotiate with one another in good faith to reach mutually acceptable agreements" with respect to a number of details of the joint plan for reorganization.

Citizens and the Committee also agreed to share whatever proceeds they received as a result of the reorganization or liquidation of the Debtor. Section 2.4 of the Agreement specified the terms of the "sharing arrangement":

Any and all net proceeds of the sale, refinancing or other disposition of the assets of SPM and also North American Album Corporation or any other entity whose assets are subject to Citizens' security interest (net proceeds is defined as those proceeds remaining after payment of administrative expenses as so defined by 11 U.S.C. § 503, specifically including attorney's fees and expenses incurred by the Committee and by Citizens) received by Citizens and/or the Creditors' Committee from Debtor's operations in whatever form said proceeds make [sic] take (including proceeds from the operation of any successor entity's business) or from the sale or disposition of the Debtor's or a successor's assets and/or stock shall be divided between Citizens and the Creditors' Committee as follows:

1. The first $3,000,000 of such proceeds shall be shared 90% to Citizens and 10% to the Creditors' Committee ...;

2. The second $3,000,000 shall be shared by citizens [sic] and the Creditors' Committee with 80% going to Citizens and 20% to the Creditors' Committee;

3. The next $3,000,000 shall be shared 70% to Citizens and 30% to the Creditors' Committee;

4. The next $3,000,000 shall be shared 60% to Citizens and 40% to the Creditors' Committee; and

5. All proceeds in excess of $12,000,000 shall go to the Creditor's Committee.

The Agreement contained a standard savings clause which provided that "[i]n the event of any term or provision hereof is invalid or unenforceable [the] remainder of this Agreement shall be valid and enforceable to the extent permitted by law."

Thereafter, the Committee and the Bank filed numerous motions, both independently and jointly, seeking unsuccessfully a change in SPM's management, a grant of relief from the automatic stay for Citizens, the appointment of a Chapter 11 trustee, and conversion of the case from Chapter 11 to Chapter 7. At a motion hearing in December 1989, the Agreement was filed with the court as an exhibit. The court expressed concern about the Agreement's sharing provision, characterizing it as a "tax-avoidance" scheme.[3] However, at no

---

3. When he first saw the Agreement, the bankruptcy judge indicated that he thought it might violate section 1129(d), which prohibits confirmation of a reorganization plan "if the principal purpose of the plan is the avoidance of taxes." 11 U.S.C. § 1129(d). Appellees long ago aban-

time during the reorganization proceedings did any creditor, the Shaines or other interested party[4] object to the mutual promises by Citizens and the Committee to cooperate during the reorganization proceedings. The court never formally approved or disapproved the Agreement before January 1991.

After it became apparent that SPM could not be successfully reorganized, the bankruptcy court granted a motion by Citizens on April 16, 1990, to appoint a receiver with the power to negotiate a sale of all of SPM's assets pursuant to 11 U.S.C. § 363(b). On December 19, 1990, SPM's assets were sold to Heritage Albums, Inc. for a purchase price of $5,000,000.00. On December 21, 1990, a previously entered order went into effect granting Citizens relief from the automatic stay, *see* 11 U.S.C. § 362, and converting the case into a Chapter 7 liquidation proceeding, *see* 11 U.S.C. § 1112(b). After conversion to Chapter 7, appellee Trustee Stern was appointed. *See* 11 U.S.C. § 701(a).

On December 24, 1990, the Committee and Citizens filed a joint motion for "Entry of Order Requiring Delivery of Proceeds and Requiring Expedited Determination" which requested distribution of the sale proceeds to Citizens. The motion recited that the entire amount was subject to Citizens' security interest pursuant to 11 U.S.C. § 506 and announced that, after receiving the $5 million and paying various administrative fees, "Citizens will distribute a portion of the net proceeds to Kamberg, Berman, P.C. [Committee's counsel] in accordance with its October 12, 1989 agreement with the Committee." At a hearing before the bankruptcy court on January 3, 1991, the Debtor and the Shaines objected to the motion, arguing that the Agreement distributed proceeds to

general, unsecured creditors ahead of the priority tax creditors in violation of the statutory scheme for distribution. *See* 11 U.S.C. §§ 724–726. Citizens and the Committee responded that the $5 million belonged to Citizens and that the Bank had a right to share its proceeds with the Committee without paying the I.R.S. or other creditors first.

The bankruptcy court granted Citizens' and the Committee's motion to the extent it requested satisfaction of Citizens' allowed secured claim for $5 million, but rejected the motion to the extent it requested approval of the Agreement's sharing provision.[5] The bankruptcy judge explained that he viewed the Agreement as a form of proceeds distribution which did not comply with the Code.

> I am not approving any distribution that is not in accordance with the priority of the bankruptcy code, and I think I made that abundantly clear a long time ago. I'm not going to have the bankruptcy code, have an end-run around it in this court. The law sets out certain priorities, and your committee has absolutely no authority to short-circuit those priorities, and I want to make that clear.

Furthermore, the bankruptcy court explained, the Committee has a duty to the bankruptcy estate.

> I rule that the committee, although it certainly had authority to negotiate something for the benefit of the bankruptcy estate, that authority was just that, for the benefit of the entire bankruptcy estate, and the committee had no authority, never thought it had—and if it did [ask for court approval], it would not have been given it—to negotiate something for the benefit of some sets of creditors of the bankruptcy estate.

doned the tax-avoidance argument, probably because the Agreement is not a "plan" requiring confirmation within the meaning of section 1129 and thus not subject to the requirements of section 1129(d).

**4.** Appellee Stern was not appointed as the Chapter 7 trustee until December 1990.

**5.** On its face, the motion by Citizens and the Committee does not request approval of the

Agreement. However, during the motion hearing, counsel for Citizens requested the court to order the Chapter 7 trustee to oversee the distribution of proceeds to the general, unsecured creditors. The court treated this request as part of the motion and refused to grant it. We consider the mechanics of the proceeds distribution *infra* in Part III.

It is perfectly true that without the agreement the bankruptcy estate would get nothing, but once the committee was in operation it had to, it's required by law, to act for the benefit of the entire estate. . . .

In accordance with its ruling at the hearing, the bankruptcy court issued a Disbursement Order on January 8, 1991, ordering the following:

1. Citizens is the holder of a valid, perfected and enforceable first security interest in all assets of the Debtor excepting only the real estate owned by the Debtor;

2. Citizens has a first priority lien and security interest in all of the post-petition accounts receivable and inventory of the Debtor;

3. Citizens' claim is allowed as a secured claim in the amount of $5,000,-000.00, with the remainder allowed as an unsecured claim;

4. The net cash proceeds from the sale of the Debtor's assets held by Goldstein & Manello [Debtor's counsel], after payment of its fee and expenses and the fee and expenses of Kamberg, Berman P.C. [the Committee's counsel], shall be paid over to Citizens by Goldstein & Manello in partial satisfaction of Citizens' claim.

5. Citizens shall pay from the net cash proceeds paid over to it by Goldstein & Manello as aforesaid such fees of the Examiner and any other party as shall be approved by order of this court after notice and hearing.[6]

Although the court acknowledged that Citizens' allowed secured claim was $5 million, paragraph six compelled Citizens to pay part of that amount to the Chapter 7 trustee for distribution to other creditors:

6. After payment of all fees, Citizens shall compute the amount due to the Committee under the agreement of October 12, 1989 between Citizens and the Committee. Citizens shall then pay such amount to the trustee in bankruptcy of SPM Manufacturing Corporation, who shall administer the same in accordance with the provisions of the Bankruptcy Code including the Code's provisions concerning priority for tax claims.

The effect of paragraph six of the order is to deprive the general, unsecured creditors of any amount they would have received under the Agreement and to benefit the I.R.S., the other priority creditors, and the Shaines who, as principals of SPM, would be personally liable for the underlying tax obligations.

Citizens and the Committee made timely objections to the order and appealed to the United States District Court for the District of Massachusetts. Trustee Stern and the Shaines appeared as appellees, and the funds were placed in escrow pending outcome of the appeal. The district court affirmed the bankruptcy court order, reasoning that it was a proper exercise of the bankruptcy court's equitable powers under section 105(a) of the Code. "[T]he Disbursement Order furthers the legislative distribution scheme in Chapter 7 cases and [ ] the Sharing Agreement, in its original form, thwarts that scheme." The district court explained that, in accordance with the Code and Massachusetts contract law, the bankruptcy court "reformed" the Agreement to comply with the distribution scheme of the Code.

The Committee filed a timely appeal from the district court's order. The Bank, conceding that the funds in escrow belong either to the Committee or to the estate, does not join the appeal. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(d).

## II. DISCUSSION

▮▮▮ The facts are essentially undisputed. The issue on appeal is whether the bankruptcy court erred as a matter of law in ordering Citizens to pay to the Trustee that portion of the Bank's secured interest which, according to the terms of the Agreement, was due to the Committee. In an

**6.** Citizens had previously agreed to the payment of counsel's fees and other administrative expenses from the sale proceeds; it had included paragraphs four and five in its proposed order attached to the joint motion.

appeal from district court review of a bankruptcy court order, the court of appeals independently reviews the bankruptcy court's decision, applying the clearly erroneous standard to findings of fact and de novo review to conclusions of law. *In re LaRoche,* 969 F.2d 1299, 1301 (1st Cir. 1992); *In re G.S.F. Corp.,* 938 F.2d 1467, 1474 (1st Cir.1991). Where the language of a contract is unambiguous, the bankruptcy court's interpretation of it is subject to de novo review. *In re Sublett,* 895 F.2d 1381, 1384 (11th Cir.1990). No special deference is owed to the district court's determinations. *In re G.S.F. Corp.,* 938 F.2d at 1474.

■ Appellees argue that the order was a proper exercise of the bankruptcy court's equitable powers under section 105(a) of the Code. The bankruptcy court has the equitable power "to issue any order, process, or judgment that is necessary or appropriate to carry out provisions" of the Code. 11 U.S.C. § 105(a). However, "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988) (unanimous decision); *see also In re Plaza de Diego Shopping Ctr., Inc.,* 911 F.2d 820, 830–31 (1st Cir.1990) ("[T]he bankruptcy court's equitable discretion is limited and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code."). That is, the bankruptcy court has no equitable power to deprive creditors of rights or remedies available to them under the Code. *See Norwest Bank,* 485 U.S. at 206–07, 108 S.Ct. at 968–69; *In re Grissom,* 955 F.2d 1440, 1449 n. 8 (11th Cir.1992). Nor does section 105(a) authorize courts to create substantive rights that are otherwise unavailable under the Code, or to expand the contractual obligations of parties. *United States v. Pepperman,* 976 F.2d 123, 131 (3d Cir.1992); *United States v. Sutton,* 786 F.2d 1305 (5th Cir.1986).

Appellees portray the bankruptcy court's order as a mere "reform" of the Agreement. In their view, the court simply substituted the bankruptcy estate for the Committee as the proper beneficiary of the sharing provision of the Agreement. Appellant responds that transferring the contractual right to receive payment from one party to a third party goes beyond mere "reform." The question now before us is whether an order compelling Citizens to pay to the estate from monies realized under its secured interest the amount required by the Agreement to be paid to the Committee is within the equitable powers of the bankruptcy court.[7] Because section 105(a) is not a source of substantive rights, the bankruptcy court's order was legitimate only to the extent that some other provision of the Code or other applicable law entitled the estate to receive the disputed funds. *See In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir.1989).

Appellees argue that the order was authorized on three different grounds: (1) the Agreement attempted to distribute property not in accordance with the priorities and distribution scheme of Code sections 507 and 726; (2) the Committee had a duty to negotiate on behalf of all creditors, not just the general, unsecured creditors; and (3) the Agreement altered the balance of power in the Chapter 11 reorganization proceedings. We consider each argument separately.

### A. *Distribution Scheme of the Code*

■ Appellees argue that allowing the general, unsecured creditors to receive money under the Agreement while priority tax creditors receive nothing would conflict with the statutory scheme for distribution of bankruptcy estate property. *See* 11 U.S.C. §§ 507, 726. Thus, they contend, the bankruptcy court properly acted in equity to prevent a violation of the Code's distribution scheme. Section 726 provides, in relevant part, that:

**7.** The parties in their briefs assume that the amount owed to the Committee under the Agreement would be approximately $700,000. However, the actual amount could be less due to payment of administrative fees and expenses prior to distribution of the proceeds. This is not a matter for us to resolve.

[P]roperty of the estate shall be distributed—

(1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of the title;

(2) second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is [timely filed.]

11 U.S.C. § 726(a). Section 507 of the Code identifies those expenses and claims which have priority over other claims, including administrative expenses allowed under section 503(b), claims for wages, and unsecured tax claims. *See* 11 U.S.C. § 507(a)(1), (3), (7).

However, the distribution scheme of section 726 (and, by implication, the priorities of section 507) does not come into play until all valid liens on the property are satisfied. *See United States v. Speers*, 382 U.S. 266, 269 n. 3, 86 S.Ct. 411, 413 n. 3, 15 L.Ed.2d 314 (1965); *Goggin v. Division of Labor Law Enforcement*, 336 U.S. 118, 126–127, 69 S.Ct. 469, 474, 93 L.Ed. 543 (1949). If a lien is perfected and not otherwise invalidated by law, it must be satisfied out of the assets it encumbers before any proceeds of the assets are available to unsecured claimants, including those having priority (such as priority tax creditors). *In re Darnell*, 834 F.2d 1263, 1265 (6th Cir.1987). Citizens held a valid lien on all of the SPM assets; these were sold for $5 million. The bankruptcy court allowed Citizens' secured claim in that amount. Clearly, then, absent the order, the entire $5 million belonged to Citizens in satisfaction of its lien, leaving nothing for the estate to distribute to the other creditors, including the I.R.S. The bankruptcy court's order forced Citizens to transfer to the estate a portion of its own $5 million notwithstanding the court's recognition of Citizens' right to receive that sum in full.

Because Citizens' secured claim absorbed all of SPM's assets, there was nothing left for any other creditor in this case. Ordinarily, in such circumstances, the distributional priorities of sections 726 and 507 would have been mooted. Appellees defend the outcome below on the ground that the Agreement improperly syphoned proceeds to the general, unsecured creditors "at the expense of priority creditors." However, it is hard to see how the priority creditors lost anything owed them given the fact there would have been nothing left for the priority creditors after the $5 million was distributed to Citizens. The "syphoning" of the money to general, unsecured creditors came entirely from the $5 million belonging to Citizens, to which no one else had any claim of right under the Bankruptcy Code.

Appellees point to the Agreement's sharing formula and ask how the parties could contemplate sharing over $12 million when Citizens' claim was worth only $9 million. The Agreement, it is said, could not contemplate dividing property that did not belong to the parties to the contract. But appellees' assertion is based on a misreading of the Agreement. The Agreement merely states that Citizens and the general, unsecured creditors will pool whatever·*they received* from the bankruptcy estate (either in a reorganization or liquidation) and will then divide the pooled funds among themselves. Any sharing between Citizens and the general, unsecured creditors was to occur *after* distribution of the estate property, having no effect whatever on the bankruptcy distributions to other creditors.

This crucial fact remains true under any scenario. When the Agreement was signed in October 1989, the value of a reorganized or liquidated SPM was unknown. Assume a liquidation would have produced $15 million after payment of the various administrative expenses. If that had happened, the first $9 million would have gone to Citizens in satisfaction of its lien, and the rest of the money would have been distributed pursuant to section 726 (assuming the case had already been converted to Chapter 7). Hence, the next $800,000 or so would have been distributed to the I.R.S. and other priority creditors, and the remaining $5.2 million would have gone to the general, unsecured creditors in virtual satisfaction of their $5.5 million claim, leaving nothing for "insiders" and other subordinated creditors. By its terms, the sharing

formula in the Agreement is to take effect only after a proper distribution under the Code. Citizens and the Committee would have pooled only their own bankruptcy dividends for a combined $14.2 million and then split this sum according to the Agreement's formula. Distributions to the I.R.S. and all other creditors under section 726 would be unaffected. Under any set of assumptions, then, the Agreement does not distribute property of the estate "at the expense of" priority creditors nor does it violate the distribution scheme of section 726 or the priorities of section 507.

■ Appellees argue, in the alternative, that the Agreement conflicts with the spirit of the Code's distribution scheme, under which priority creditors always get paid in full before general, unsecured creditors receive anything. Appellees contend that Congress never wanted unsecured creditors—especially creditors represented by the official creditors' committee—to be able to "circumvent" this scheme by negotiating with secured creditors to increase the return received for their claims against the debtor. Appellees' theory, however, goes beyond anything appearing expressly or by implication in the Code. Section 726 and the other Code provisions governing priorities of creditors apply only to distributions of property of the estate. The Code does not govern the rights of creditors to transfer or receive nonestate property. While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors, see *King v. United States*, 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315 (1964), creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors. *Cf. In re Allegheny Int'l, Inc.*, 100 B.R. 241, 243 (Bankr. W.D.Pa.1988) (remarking that the Code "does not permit a debtor to pay its prepetition debts to suppliers, at a discount or otherwise, before confirmation of the plan, but it appears to allow third parties to purchase the claims of those suppliers").

In this case, the proceeds of the sale of SPM's assets pursuant to 11 U.S.C. § 363 were property of the estate and thus the Code governed their use and distribution. However, once the court lifted the automatic stay and ordered those proceeds distributed to Citizens in proper satisfaction of its lien, that money became the property of Citizens, not of the estate. Appellees concede that the bankruptcy court has no authority to control how Citizens disposes of the proceeds once it receives them. There is nothing in the Code forbidding Citizens to have voluntarily paid part of these monies to some or all of the general, unsecured creditors after the bankruptcy proceedings finished.

Thus, appellees' argument reduces to contending that although a secured creditor is free to share its proceeds with nonpriority creditors after bankruptcy proceedings have concluded, it may not enter into a contract *during* bankruptcy in which it promises to do the same thing. Again, appellees' argument lacks statutory support for it confuses estate property and nonestate property. The parties' agreement to share the proceeds could be seen as a partial assignment by Citizens and the general, unsecured creditors of their rights to receive bankruptcy dividends.[8] *See* David Gray Carlson, *A Theory of Contractual Debt Subordination and Lien Priority*, 38 Vand.L.Rev. 975, 996–1004 (1985). A right to receive payment is freely transferable and assignable in Massachusetts without the consent of the debtor and without affecting the debtor's obligation to pay the underlying debt. *See* Mass.Gen.L. ch. 106, § 9–318; *Graves Equipment, Inc. v. M. DeMatteo Constr. Co.*, 397 Mass. 110, 489 N.E.2d 1010, 1012 (1986) ("Section 9–318(1)(a) incorporates the common law rule that an assignee of contract rights stands in the shoes of the assignor...."). The Agreement did not affect estate property, i.e., the sale proceeds, but only concerned the contracting parties' *claims* against the estate, i.e., their rights to be paid by the estate. We find no support in the Code for

---

**8.** We do not decide exactly how to categorize the Agreement because that issue is not neces-

sary to our decision. *See infra* note 13.

banning this type of contractual assignment in all cases.

■■■ Appellees suggest the policy of the Code is that, regardless of the source of the payments, nonpriority creditors should never receive a return on their claims if priority creditors receive nothing. This theory of Code policy is directly contradicted by the fact that nonpriority creditors routinely receive payment from third parties for their claims without interference by the bankruptcy court. Unsecured creditors often sell their claims to third parties, e.g., for 30 cents on the dollar, in order to avoid the uncertainty and delay of bankruptcy proceedings. *See* Chaim J. Fortgang & Thomas Moers Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11*, 12 Cardozo L.Rev. 1, 2–3 (1990). The Code does not speak to the validity of claim transfers, and the Bankruptcy Rules provide only procedures for the filing of notice required for a transferee to be recognized as the holder of the claim. *See* Bankr.Rule 3001(e)[9]; *In re Odd Lot Trading, Inc.* 115 B.R. 97, 100 (Bankr.N.D.Ohio 1990); Fortgang & May-

er, *Trading Claims*, at 19–25. The circumstances in which claims transfers are expressly said to be invalid are limited. For example, the purchasing of claims by an affiliate or insider of the debtor for the sole purpose of blocking the confirmation of competing plans may constitute "bad faith" for the purposes of section 1126(e), 11 U.S.C. § 1126(e). *See In re Applegate Property, Ltd.*, 133 B.R. 827, 834–35 (Bankr.W.D.Tex.1991). An assigned claim may be limited if the assignment involves a breach of fiduciary duty or fraud and the breach of duty or fraud enables the assignee to acquire the claim for inadequate consideration. *In re Executive Office Centers, Inc.*, 96 B.R. 642, 649 (Bankr.E.D.La. 1988). However, absent some effect on the administration of the estate or diminution of estate property, neither the Code nor the Rules prohibit or discourage creditors from receiving cash from nondebtors in exchange for their claims.

While the Agreement in this case might not be categorized as a "transfer" under Rule 3001(e),[10] the financial outcomes pro-

9. Bankruptcy Rule 3001(e)(2) sets out the procedures for transfers of claims other than for security after proof of the claim is filed:

If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail.... If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

Bankr.Rule 3001(e)(2).

Prior to 1991, some courts interpreted Rule 3001 as authorization for courts "to monitor the manner in which claims are transferred or assigned and thereby prevent, inter alia, the improper proliferation of claims, wrongdoing and inequitable conduct." *In re Ionosphere Clubs, Inc.*, 119 B.R. 440, 443 (Bankr.S.D.N.Y.1990). Rule 3001(e) was amended in 1991 to restrict the bankruptcy court's power to inspect the terms of such transfers. *See In re Odd Lot Trading, Inc.*, 115 B.R. 97, 100–01 (Bankr. N.D.Ohio 1990). Transfers are no longer required to be unconditional and assignees do not

have to submit to the bankruptcy court the terms of the transfer for its approval. Consequently, under the amended rule, the bankruptcy court cannot disapprove the transfer because of its terms, e.g., inadequate consideration. The 1991 Advisory Committee Note explains that:

Subdivision (e) is amended to limit the court's role to the adjudication of disputes regarding the transfer of claims.... If a claim has been transferred other than for security after a proof of claim has been filed, the transferee is substituted for the transferor. In that event, the clerk should note the transfer without the need for court approval. If a timely objection is filed, the court's role is to determine whether a transfer has been made that is enforceable under nonbankruptcy law. This rule is not intended either to encourage or discourage postpetition transfers of claims....

Bankr.Rule 3001, Advisory Committee Notes, 1991 Amendment.

10. We do not decide whether the Agreement in this case constitutes a "transfer" of claim subject to the requirements of Rule 3001 because appellees did not raise this issue. Even if notice of the Agreement should have been but was not filed with the court, that failure would not authorize the bankruptcy court to void or alter the Agreement. Failure to file notice of a transfer under Rule 3001(e) only affects the standing of

duced by the Agreement and by outright claim transfers are analogous. If the general, unsecured creditors in this case had sold their claims to Citizens (or another third party) for cash, e.g., for ten cents on the dollar, after all was said and done the priority creditors would have received nothing and the general, unsecured creditors would have received approximately $550,-000 (10% of their $5.5 million total claim). The bankruptcy court would have had no authority to prevent the general, unsecured creditors from transferring their claims. In comparison, under the Agreement's sharing arrangement the general, unsecured creditors would receive, under the parties' calculations, *see* note 7, approximately $700,000 (about 12.5% of their claims) while priority creditors receive nothing. Given authority in the Bankruptcy Code and Rules to permit outright transfers resulting in general, unsecured creditors receiving some money for their claims, we see nothing to prohibit the same result if produced by a partial assignment or sharing of claims such as accomplished by the Agreement in this case.

Because Code provisions governing priorities and distribution of estate property gave the estate no right to share in proceeds from Citizens' secured claim, the bankruptcy court derived no right under those same provisions to order Citizens to pay a portion of its own claim proceeds to the estate.

### B. *No Fiduciary Duty to the Estate*

Appellees argue that the bankruptcy court had the equitable power to order Citizens to pay to the estate the amount due to the Committee under the Agreement because, as the bankruptcy court ruled:

> [T]he committee, although it certainly had authority to negotiate something for the benefit of the bankruptcy estate, that authority was just that, for the benefit of the entire bankruptcy estate, and the committee had no authority ... to negotiate something for the benefit of some

sets of creditors of the bankruptcy estate.

Appellees do not contest the bankruptcy court's ruling that the Committee had the general power to enter contracts. The Code expressly authorizes a committee to "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). Appellees also concede that the Committee's appointment pursuant to 11 U.S.C. § 1102(a) charged it only with representation of the general, unsecured creditors (not with representation of the I.R.S. or other priority creditors). Nevertheless, they contend, any agreement negotiated by the Committee should have been negotiated to benefit the estate as a whole and thus any contractual right to receive payment from Citizens rightfully belongs to the estate.

■ We do not accept this contention, as it seems based on the erroneous assumption that the Official Unsecured Creditors' Committee is a fiduciary for the estate as a whole. While a creditors' committee and its members must act in accordance with the provisions of the Bankruptcy Code and with proper regard for the bankruptcy court, the committee is a fiduciary for those whom it represents, not for the debtor or the estate generally. *In re Microboard Processing, Inc.,* 95 B.R. 283, 285 (Bankr.D.Conn.1989); *In re Johns–Manville Corp.,* 60 B.R. 842, 853 (S.D.N.Y.), *rev'd on other grounds,* 801 F.2d 60 (2d Cir.1986). Thus the committee's fiduciary duty, as such, runs to the parties or class it represents. *Markey v. Orr,* No. G89–40886, 1990 WL 483808 at *4, 1990 U.S.Dist. LEXIS 3005 at *9–*10 (W.D.Mich. 1990); *Pension Benefit Guar. Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein P.C.,* 42 B.R. 960, 963 (E.D.Pa.1984); *Microboard,* 95 B.R. at 285; *Johns–Manville,* 60 B.R. at 853. It is charged with pursuing whatever lawful course best serves the interests of the class of creditors represented. *In re Seaescape Cruis-*

the transferee as a "creditor" and thus the duty of the trustee to make payment on the claim to the transferee. *See* Bankr.Rule 3001(e); *In re*

*FRG, Inc.,* 124 B.R. 653, 656–57 (Bankr.E.D.Pa. 1991); *In re Oxford Royal Mushroom Prods., Inc.,* 93 B.R. 390, 397 (Bankr.E.D.Pa.1988).

*es, Ltd.,* 131 B.R. 241, 243 (Bankr.S.D.Fla. 1991).

In this case, the Committee reasonably determined that entering into the Agreement with Citizens was in the best interests of the class it represented, *to wit,* the general, unsecured creditors. No general, unsecured creditor objected to the Committee's decision, *see In re Seaescape Cruises,* 131 B.R. at 243–44, nor have appellees offered any evidence or reason for us to believe that the represented class would have been better off had the Committee not acted as it did. The contrary appears true. Although the Shaines and the Debtor may have preferred a less active committee, and one more sympathetic to them, an effective creditors' committee must sometimes be adversarial if it is to fulfill its role in a Chapter 11 case. *In re Seaescape Cruises,* 131 B.R. at 243; *In re Daig Corp.,* 17 B.R. 41, 43 (Bankr.D.Minn.1981).

> The creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally. On the contrary, it is purposely intended to represent the necessarily different interests and concerns of the creditors it represents. It must necessarily be adversarial in a sense, though its relation with the debtor may be supportive and friendly. There is simply no other entity established by the Code to guard those interests. The committee as the sum of its members is not intended to be merely an arbiter but a partisan which will aid, assist, and monitor the debtor pursuant to its own self-interest.

*In re Daig Corp.,* 17 B.R. at 43. We conclude, therefore, that the bankruptcy court erred as a matter of law insofar as it felt that the Committee was under a particular duty to negotiate the sharing provision of the Agreement for the benefit of the estate as a whole.

### C. *Balance of Power in Reorganization Proceedings*

Appellees contend that the bankruptcy court's order equitably prevented Citizens and the Committee from forming an alliance which would destroy the "balance of power" allegedly created by the Code, especially sections 507 and 1129. The Agreement between Citizens and the Committee,

appellees argue, frustrated SPM's attempts to reorganize and, if similar agreements are permitted in future cases, could create "chaos" and "free for alls" in reorganization proceedings.

The first part of appellees' argument—that the Agreement actually prevented the Debtor in this case from successfully reorganizing—was not timely raised below and we do not, therefore, consider it. Issues not raised in the bankruptcy court are ordinarily not considered for the first time on appeal. *In re LaRoche,* 969 F.2d 1299, 1305 (1st Cir.1992); *In re Burgess,* 955 F.2d 134, 136 n. 2 (1st Cir. 1992); *Liakas v. Creditors' Committee of Deja Vu, Inc.,* 780 F.2d 176, 179 (1st Cir. 1986). This principle applies to cases where, as here, a party attempts to justify a bankruptcy court order with a theory not raised before or considered by the bankruptcy court. *In re Sun Runner Marine, Inc.,* 945 F.2d 1089, 1095 (9th Cir.1991). Though the Shaines knew of the Agreement's existence since December 1989, they never complained to the bankruptcy court about Citizens' and the Committee's joining of forces during the reorganization proceedings; they raised questions only about the distribution of Citizens' proceeds to nonpriority creditors. The bankruptcy court gave no indication in its findings and rulings that it was bothered by that aspect of the Agreement. Not until oral argument before the district court hearing on this appeal did the Shaines and the Trustee invoke the alleged negative effects on reorganization of the Citizens–Committee alliance.

It is true that, in the interest of justice, parties are sometimes permitted to offer unraised alternative rationales for affirming a judgment. *See, e.g., In re Killebrew,* 888 F.2d 1516, 1521 (5th Cir.1989). But appellees' contention here that the Agreement disrupted the Debtor's reorganization proceedings is essentially a factual issue requiring findings of fact not now contained in the record before us. The bankruptcy court, not the district court or court of appeals, is the only tribunal equipped to make evidentiary findings on relevant fac-

tual matters such as whether the parties acted in bad faith, whether the parties intended to frustrate attempts to reorganize the Debtor, and whether the parties' actions actually prevented the Debtor from successfully reorganizing. *See* Bankruptcy Rules 7052, 8013; *In re Sublett*, 895 F.2d at 1384. We are in no position to ascertain by ourselves whether the Agreement, in fact, interfered unjustifiably with the reorganization proceedings. *See In re Sun Runner Marine*, 945 F.2d at 1095 ("We do not know what legal standard the bankruptcy court would have applied, or whether the bankruptcy court would have found facts warranting [the parties' requested order], had that issue been presented to it.")

We respond briefly to appellees' warning that if this agreement stands, creditors in the future will form alliances to defeat attempts to reorganize, extort higher payouts from debtors, and generally create chaos in Chapter 11. Our focus is necessarily on the particular agreement before us, to see whether it conflicts with the reorganization provisions of Chapter 11 and whether the record supports appellees' portrait of the dire effects of giving effect to such a contract. Insofar as we can see, the parties' promises made in the Agreement were well within their rights under the Bankruptcy Code: they agreed to move the bankruptcy court to replace the Debtor's current management, *see* 11 U.S.C. § 1104(a), (b), and to propose a plan of reorganization, *see* 11 U.S.C. § 1121(c). The record shows that, in addition to the joint motions contemplated by the Agreement, the parties moved for conversion of the case to Chapter 7. This action was allowed by 11 U.S.C. § 1112(b). We see no indication in the Agreement that Citizens and the Committee agreed to vote for or against any particular plans, a restriction which could raise charges of bad faith. *See* 11 U.S.C. § 1126(e); *Young v. Higbee Co.*, 324 U.S. 204, 210–11, 65 S.Ct. 594, 597–98, 89 L.Ed. 890 (1945). Appellees have not pointed to any other Code provision implicated by the parties' cooperative efforts. Looking at the ones mentioned, we cannot find support for appellees' assertion that this agreement conflicts with any

policy in favor of reorganizations manifested by Chapter 11.

As for future cases, we note that the bankruptcy court always retains the power to monitor and control the tenor of reorganization proceedings. If the unsecured creditors' committee fails to be properly representative of the unsecured creditors, any party in interest can move to have the committee reconstituted. *See* 11 U.S.C. § 1102(a)(2); *In re Daig Corp.*, 17 B.R. at 42. If an entity's acceptance or rejection of a plan is not made in good faith, or was not solicited or procured in good faith, the court can disqualify that vote. *See* 11 U.S.C. § 1126(e). The good faith requirement bars creditors from casting their votes from ulterior motives, such as coercing a higher payment from the debtor's estate, pure malice, and advancing the interests of a competing business. *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir.1988). The record contains no evidence that Citizens and the Committee harbored any such sinister designs.

Appellees assert that creditors should not do anything to alter the usual divergence of interests between secured and unsecured creditors. While secured creditors might generally prefer liquidation and unsecured creditors might generally support reorganization, the Code surely does not require them to take such positions. No two creditors have identical interests, *see In re Microboard Processing, Inc.*, 95 B.R. at 285, and the Code implicitly recognizes that fact by providing a procedural framework for handling the various divergent interests of the parties to a bankruptcy. *See* Elizabeth Warren, *Bankruptcy Policy*, 54 U.Chi.L.Rev. 775, 785–89 (1987); *see also* Elizabeth Warren & Jay Lawrence Westbrook, *The Law of Debtors and Creditors* 427–35 (2d ed. 1991). While unsecured creditors may sometimes share common objectives with the debtor and current management, they are not required to rubber stamp the proposals of the debtor nor to support the retention of current management. *See In re Federal Support Co.*, 859 F.2d at 19 ("It is well settled [ ] that good faith in casting a vote does not require of

the creditor a selfless disinterest.") The duty of the unsecured creditors' committee to pursue the best interests of the unsecured creditors requires different outcomes in different situations, and may entail entering contracts regarding reorganization plans, *see, e.g., In re Donlevy's Inc.,* 111 B.R. 1, 2 (Bankr.D.Mass.1990), recommending rejection of a debtor's plan of reorganization, or filing motions to convert a Chapter 11 case to Chapter 7, *see, e.g., In re Seaescape Cruises, Ltd.,* 131 B.R. at 243. For the reasons discussed, we do not think that the bankruptcy court's order was justified as a means to enforce the rules or policies spelled out in Chapter 11.[11]

### D. *Other Arguments*

 We briefly dispose of the parties' other arguments. We reject appellees' argument that Citizens, by agreeing to share some of its bankruptcy proceeds with the Committee, "carved out" or "divested itself" of a portion of its lien and thus the court "simply used its equitable powers to determine who best was entitled to receive this carved out portion" of Citizens' claim. This argument is untenable because no appeal was taken from the bankruptcy court's express ruling that Citizens, pursuant to its $5 million allowed secured claim, was entitled to receive the entire sale proceeds. Furthermore, under Massachusetts law a valid assignment of a debt does not divest the claim of its priority or alter the debtor's obligation to pay the debt; the assignee steps into the shoes of the assignor for the portion of the claim assigned.[12] *See* Mass.Gen.L. ch. 106, § 9–302(2); *Grise*

*v. White,* 355 Mass. 698, 247 N.E.2d 385, 388 (1969).

Because the bankruptcy court's order compelling Citizens to pay the estate from the proceeds of its security interest was not authorized by section 105(a), we need not consider the Committee's argument that section 510(a), 11 U.S.C. § 510(a), required the bankruptcy court to give effect to the Agreement as a subordination agreement.[13] And because the Agreement did not conflict with federal bankruptcy policy, there is no need to resolve the parties' dispute as to when and to what extent courts may, under Massachusetts law, reform contracts which violate public policy.

### III. CONCLUSION

For the reasons discussed above, we hold that the bankruptcy court erred as a matter of law in ordering Citizens to pay to the Trustee the amount due to the Committee under the Agreement. Accordingly, we reverse the judgment of the district court and vacate paragraph six of the bankruptcy court's Disbursement Order of January 8, 1991.

No question is raised in this appeal as to whether the Agreement is binding on Citizens and the Committee. Indeed, Citizens previously expressed, at hearings before the bankruptcy court and the district court, its complete willingness to abide by its obligation under the Agreement to pay the Committee the agreed share of the sale proceeds. At the hearing on January 3, 1991, counsel for Citizens requested the court to order the Chapter 7 Trustee to

---

11. Even, indeed, if an alliance of the type reflected in the Agreement were believed to contravene bankruptcy policies, the remedy—ordering Citizens to pay out to the estate funds it had agreed to pay to the Committee—would seem questionable. If the Agreement violated public policy, the more usual remedy would be to declare it invalid and unenforceable rather than to enforce it, out of Citizens' pocket, in favor of a nonparty to the Agreement.

12. We assume, for the moment, that the Agreement could be characterized as a partial assignment of the parties' claims. As explained *infra* note 13, the issue of how to characterize the Agreement is not before us.

13. How to categorize the Agreement is no simple question. It has attributes of both a partial assignment and a subordination agreement. *See generally* David Gray Carlson, *A Theory of Contractual Debt Subordination and Lien Priority,* 38 Vand.L.Rev. 975 (1985) (discussing the characteristics of and enforceability of various types of subordination and assignment agreements in bankruptcy). Even if it cannot be deemed a subordination agreement for purposes of enforcement pursuant to 11 U.S.C. § 510(a), the question on appeal is not whether the Agreement is valid and enforceable, but whether the bankruptcy court had authority under the Code to issue its order.

oversee the distribution of the proceeds to the general, unsecured creditors. Appellees Robert and Frances Shaine point out in their appellate brief that the mechanics of distributing these proceeds to the general, unsecured creditors were not made clear in the Agreement, nor did the bankruptcy court decide how the proceeds should be handled.

Consequently, having reversed the bankruptcy court's order, we remand to the bankruptcy court to determine whether to allow Citizens' motion to have the Trustee administer the distribution of the funds due to the general, unsecured creditors under the Agreement. Appellant has not pointed to any basis in the Code for authorizing, let alone requiring, the bankruptcy court or Trustee to administer a distribution of nonestate funds pursuant to a private agreement. However, because we lack a complete record and because the precise issue was not appealed, we leave it up to the bankruptcy court to decide, in the first instance, whether to order the Trustee (rather than Citizens) to administer the distribution, and to determine the allocation of any related administrative expenses. If the bankruptcy court determines that the Trustee should not oversee distribution, or if Citizens withdraws its motion for the Trustee to administer the funds, then the bankruptcy court shall distribute the funds in escrow, including accrued interest, to Citizens subject to any proper administrative charges or other obligations.

*The district court judgment is reversed, the bankruptcy court order is vacated in part, and the matter is remanded for further proceedings not inconsistent herewith. Costs to appellant.*

### ON PETITION FOR REHEARING

Feb. 24, 1993.

Before BREYER, Chief Judge, CAMPBELL, Senior Circuit Judge, TORRUELLA, SELYA, CYR, BOUDIN,** Circuit Judges, and BRODY,*** District Judge.

** Judge Norman Stahl has recused himself.

*** Of the District of Maine, sitting by designa-

### ORDER OF COURT

The panel of judges that rendered the decision in this case having voted to deny the petition for rehearing and the suggestion for the holding of a rehearing en banc having been carefully considered by the judges of the Court in regular active service and a majority of said judges not having voted to order that the appeal be heard or reheard by the Court en banc,

It is ordered that the petition for rehearing and the suggestion for rehearing en banc be denied.